and Nelson. I think that starting with 10 after 12, I was just looking and seeing 10 after 12 and you're starting, and I think that writes a cruel and unusual punishment. We appreciate that. Thank you all for your patience. I agree. So then there'll be a summary reversal and I can leave. Why don't you leave and find out? All right. With that. With that. I'm John Wallenstein and I represent Jonathan Garcia. So I think what's important here is that the venue argument, I think, is the most important. This case had no business being in the Southern District. It should have been in Brooklyn in the Eastern District because the murder occurred in Queens. The government argues that, well, the Latin Kings operate everywhere and therefore the Southern District is appropriate. But I think that's incorrect because I don't think the murder is connected to the general Latin Kings conspiracy. I think the murder is more of a personal nature. I think that the- Is that a venue argument or is that an argument that this isn't in fact a murder in aid of racketeering? Well, it's a little bit of both, I suppose. But it's really a venue argument because assuming that Garcia committed the murder in Queens, then he did it in furtherance of his own fear that he was going to be stripped of his Latin King credentials, I suppose. But that was related to his membership in the Woodhaven Mayans, which is separate, I think, from the general Latin Kings. And that's akin to what you have in the mafia cases, Gigante and the others, where you have this general mafia, La Cosa Nostra, and then you have Colombo, Bonanno, and so forth. Here you have the Latin Kings, the Woodhaven Mayans, the black mob that operates out of the Bronx, but they're not necessarily all connected in the general conspiracy. So if Garcia is in the Woodhaven clique and he is concerned about his position there, then that's the conspiracy that we need to consider. But was he worried about being stripped of his membership in the Woodhaven clique, or was he worried about being stripped of his status as a Latin King? Well, I think it's unclear, but I— Was the individual who he was afraid was going to strip him associated with the Woodhaven group? I believe so. Okay. And so—and I think the murder was a spur-of-the-moment thing. It was sort of a self-defense. He didn't bring the gun. Somebody else brought the gun there. Somebody handed him the gun. He fired the gun. Everybody ran, and he fired a couple more times, according to the evidence that was induced at the trial. So I think that all of that occurred in Queens. The hearsay statements that we also challenge related more to the black mob, which is a Bronx thing, related more to general Latin King stuff, which, again, the Bronx, Manhattan, but has nothing whatever to do with what happened in Queens. And they are all the statements that are attributed to Mr. Garcia and to others who then attribute, through double hearsay, to Mr. Garcia. All of those statements seem to be, after the fact, not connected to the murder conspiracy. Because, according to the governance theory, Garcia was using the killing to increase his standing within the organization. In fact, he made an application to join. In fact, he actually had an interview with someone who actually turned and became an informant for the government. With regard to the fact that he killed this guy because this fellow had done the wiping out or whatever it was that they were going to do with him. And then he became a member, joined the other group within the Latin King. So if he uses the murder, where the murder occurs is relevant in some way. But if he's using it to increase his standing within the organization, it being a RICO, a murder conspiracy or allegation, and that occurs within the Southern District, isn't that inappropriate and or aren't those statements appropriate? Well, I think the problem there, Judge Wesley, is that the murder we know happens in Queens. My argument is that the Woodhaven Myers is the conspiracy that we ought to be considering. And if Garcia then goes later to somebody in the black mob and says, hey, I was a good guy in Queens for you. Now let me join the Bronx. And he uses that murder to increase his standing within it. Doesn't that then fit within the model? I think that's a separate conspiracy. I think now the black mob is that conspiracy that we're talking about. It's not the murder conspiracy, even though he's saying I did this and now you've got to let me come in and join your group. I think that's a separate conspiracy. I think it's a even though it's all under the Latin King umbrella. I don't think that's any different than Giganti with the La Cosa Nostra umbrella. Well, Giganti had nothing. Giganti was having a murder attributed to him that he'd never committed in any way, shape, or form, and statements that are being made separate from that. This is the shooter and his statements relative to, hey, I'm a tough guy. I took care of this guy. I'm not to be fooled with. I belong in this particular group. I mean, Giganti's a different model. Well, in that respect, yes. But I think that – In that respect, I mean, it is – I mean, Giganti's not in any way relevant to the circumstances here with regard to, A, the act, and, B, the statements that are used and the fact that other people within the organization are talking about or relating what he was up to, right? Well, I think that's the point, that the other people within the organization are not within the Woodham and Meyer organization. They're within the Black Mob or other Latin King cliques. They're not within the specific conspiracy to which the murder should be attributed. Therefore, I say it shouldn't be a mystery. And I take it your argument has to be not only that that's how we – the best way to look at the evidence, but that there's no evidence from which the jury could have connected the Black Mob-related stuff to the murder. That's right. All right. Appreciate it. Thank you. Thank you. Attorney Carlin. Yes. Good afternoon. I'm Stephanie Carlin. I'm counsel for Christopher Nelson on this appeal. As the court knows, this is an appeal of a sentence and a violation of supervised release. The argument, the primary argument that I've made is that trial counsel provided ineffective assistance of counsel. This is not a normal ineffective assistance of counsel case where we're taking issue with certain things that counsel did or didn't do. This is a situation where trial counsel explicitly and implicitly denigrates his client, talks repeatedly about counsel's own personal feelings of disappointment, hurt, shock, frustration at what his client has done. And counsel says that in sentencing submission to the court and an oral argument in front of the court. I don't think any of it. Why can't that be a legitimate strategic choice to say, gosh, this is such a flagrant breach of the court's trust that I'm not going to get any traction pretending like it's not. And so let's own that right up front and then try to walk the court, you know, talk the court off the ledge a little bit as to why the court should sort of set those feelings aside. Because it seems pretty inescapable that regardless of what counsel says, the court is going to have that reaction. So counsel can either fight that or work with it. Absolutely, Judge. That would be a completely legitimate approach. As I said in my brief, there's an elephant in the room. And the elephant in the room is this is conduct. The client gets arrested within a week after he's allegedly admits that he committed criminal conduct within a week after being released. But that's not what counsel did. Of course counsel had to contend with what had happened, with the underlying facts of the case. What counsel does is personalize it. What counsel does says it hurt me, it anchored me, it frustrated me. That is improper. Why is that a way to say to the judge we're both in the same situation? And my heavens, this is, you know, how I come out. I think he should come out that way too. He's trying to associate himself with the feelings of a judge who he thinks the judge thinks has been betrayed by somebody in whom the judge gave trust. First of all, Your Honor, that's exactly my second point, which is we're not a team. It's not us. We together can't be disappointed because things didn't work out the way we hoped. That's the government. They're on one side of the line. I'm defense counsel. I'm on another side of the line. And, yes, of course you have to acknowledge and try to figure out what it is a judge might be considering. That does not give me the right to denigrate my client to the court, which is what happened here. Well, I mean, this is really, Judge Caproni said of all the people she'd ever had, this was the first, fastest violation of his release she'd ever had. She was pretty upset with him. And I agree with you that it's a little unusual. But by the same token, he did say those things. But then he went on and said, look, this kid had a hard life. So he turned to advocacy, and he did argue for some leniency with regard to it. I mean, the guy was doing drug deals with less than two weeks after he's released, and he got a deal. He got a terrific deal. I mean, the lawyer did an incredible job for him. And he turns around, and he starts selling to the same people he'd previously been selling to. Caproni was not happy. The judge was really mad. You're absolutely right, Your Honor. And that might be why a lawyer might be disappointed. But you can't say that. So you're saying categorically, the simple fact that he said, I'm disappointed in my client. I'm personally disappointed in my client. Well, first of all, that's unethical and improper. The same way that the government can't vouch for an FBI agent, for example, in a summation. The prosecution can't say, I believe that witness. Defense counsel can't do the opposite and say, I think my client's a bad guy. I think my client disappointed me. There is a duty of advocacy. There is a duty of loyalty. And there's a duty to keep in mind whose team you're on. Do you think we should deny or we should not consider this and let this be resolved at a collateral hearing in habeas because the underlying strategies of counsel aren't really in front of us? No, because, Your Honor, I am not claiming, I'm not arguing that there's. Well, go ahead. I'm not arguing that it was a bad strategy. I'm saying it was improper. So you're saying that the rule that should come out of this is that any time a lawyer says, my client is a bad person and did something horrible, that's a violation of his or her responsibility under the Sixth Amendment? I don't think to say my client did something horrible. The evidence reflects he got out after being released on supervised release and within a week he was selling drugs. I don't think, obviously, you have to deal with that. What you can't do is you can't personalize it. You can't throw your client under the bus because he's disappointed you because we worked so hard. How is his disappointment relevant to the conclusion? It's not relevant. That's exactly my point. This trial counsel had no business talking about his own feelings of disappointment, about anger, frustration. If it's not relevant, how is it prejudiced? It's prejudicial because I have a right to have an attorney who's on my side, an attorney who is effectively representing me, an attorney who is advocating zealously on my behalf. Part of your brief sort of focuses on here's some arguments counsel could have made.  And so that aspect of the analysis raised for me the same question that my colleague just asked, which is, is this a proper case to depart from the general pretty strong preference for leaving ineffective assistance arguments for habeas review because then you can develop a record on that. And I gather your answer is you're looking for a per se rule that the argument as framed is always ineffective as a matter of law. So it doesn't matter what other arguments were or weren't available. That's right, Your Honor. I'm claiming that it's structural error. I'm not. I put in some examples of what possibly could have been done to demonstrate the assertion that counsel did not serve as an effective advocate. But I'm not engaging or asking the court to engage in a prejudice analysis, just the opposite. I'm saying this was structural error. Thank you. Thank you. So I'm assuming this is sort of a weird argument set up because these two defendants, there's nothing about these cases that talks to each other. So I'm assuming you're going to start with one and maybe take whatever questions we have and exhaust our conversation about that and then shift to the other. Is that sort of a reasonable expectation? That was my plan, Your Honor, if that works for the court. So may it please the court, my name is Patrick Moroney. I represent the United States on appeal, as I did before the district court as to both defendants. So starting with Defendant Garcia and his challenge to venue and his sort of related challenge to the sufficiency of the evidence as to what his purpose in committing the murder was. You know, on the question of the purpose in committing the murder, the jury was instructed that one of the elements of the murder was that it needed to be in order to maintain or increase his position in the charge conspiracy, which was the Latin Kings. And, you know, the defendant didn't raise this sufficiency challenge in the district court. So in addition to the usual sufficiency standard, whether any reasonable juror could have found it beyond a reasonable doubt, it's also subject to plain error as well. And I think there was no— What does that add? I was trying to figure out, like, if no reasonable—if we conclude that no reasonable jury could reach this conclusion, what is—how does plain error get us an opportunity to say, but even though no reasonable jury could reach this because it wasn't raised below, we're—you know what I'm saying? No, I understand. I think it just adds—I think it needs to be even more obvious, Your Honor, than the typical sufficiency standard and I think go to the integrity or the integrity of the proceedings. You know, I think to put it simply, the defendant's own words, he explained his reason for committing the murder, which was that they were trying to kick him out of the Latin Kings. And so those words in themselves are more than sufficient. The case law here, if you look at the White case, the reason for committing the murder and doing so to maintain or increase his position in the game doesn't need to be the sole reason for the murder. It can be one of several motivating reasons. As to the venue point, I think this case is—the Saavedra case is directly on point. That was coincidentally also a Latin Kings case, a violent crime that took place in the Eastern District. And this court concluded the venue was proper in the Southern District because the racketeering enterprise was based in the Southern District. And the facts that the court looked to in Saavedra are also present here. The Latin Kings' leadership was based out of the Bronx. They sold drugs and committed violence in the Bronx, including drug sales, to cooperating witnesses in this case. And there were meetings held in the Bronx. And, in fact, the defendant himself attended those meetings. So unless the court has any other questions on Garcia, I'll turn to Defendant Nelson. I think just to kind of pick up to the point Judge Wesley and Judge Robinson raised about whether it makes sense to leave this for a 2255, you know, I think counsel isn't really appreciating the second prong of Strickland, the prejudice prong, which is that, you know, there's a reasonable probability that but for counsel's purported error, the outcome would have been any different. I thought counsel was suggesting this is a structural error, so we're not really concerned with that second level. Am I misunderstanding that? Well, I think as to the structural error point, I mean, this doesn't come anywhere close to the types of error this court has found to be structural, right? Deprivation of counsel at one's choice, closing courtroom, things like that. Just to spitball a little bit, if denying somebody counsel would be a structural error, why wouldn't having counsel that's so deficient that they undermine the case, why wouldn't that sort of also be structural? Well, I think it's related, and I think that's why there is the second prong of Strickland, which kind of gets to the structural error question. But this court and the Supreme Court have been very narrow in the types of errors that are structural, and I think that would also sort of read out the second element of Strickland. But for the reasons John has pointed out, the speed with which the defendant, Mr. Nelson, went back to committing crime, the fact that he got an enormous break on his initial sentence, he got time served when he was probably looking at a sentence far beyond that, the fact that he completely cut off communication with his probation officer, I think, and given Judge Capone's comments, it's difficult to believe that he would have received any different sentence had counsel approached the argument differently. So unless the court has any other questions, we'll rest on our brief. Thank you. Thank you. All right. Attorney Wallenstein. Thank you. To be honest, I think that I've made my points in my argument. I understand Mr. Maroney's points, but there's no point in my repeating what I said earlier. So unless the court has any questions, I'll rest on my argument and my briefs. Thank you. Thank you. Just to briefly respond a little bit to the government, it is correct, Your Honor, Your Honors, that I am claiming structural error. So the issue of prejudice is not before the court. If this court accepts the argument that the client's counsel's conduct violated the Sixth Amendment, then the question becomes was it structural error. And I would assert that it is very similar what happened here to some of the cases that Mr. Maroney mentioned, which is deprivation of right to counsel, entirely also the Supreme Court case McCrory v. Louisiana, where counsel conceded his client's guilt of one of the offenses over the client's objections. What if we, what if we, this is all hypothetical. Yeah. What if we concluded there was error? And what if we concluded that the concept of structural error didn't apply here? Are you making an argument as to the level of prejudice that this caused, or if you lose on the structural question, you're probably done? I am not making an argument with respect to prejudice, Your Honor. I think it is clear, I do not disagree with the government, that it's clear from the record that Judge Caproni likely would have imposed the same sentence. However, I have a right to have a lawyer who functions within the meaning of the Sixth Amendment as my zealous and loyal advocate, and regardless of whether the outcome might or might not have been different. So in the taxonomy of structural errors, it's not that this falls in the box. It says it's presumptively always sufficiently prejudicial. It's the box that says it doesn't matter if it's prejudicial because it undermines a basic trial right, like the right to counsel or the right to unbiased judge or something like that. I think the sort of language the Supreme Court has used is that an error that has to do with the framework in which the trial takes place. At the time when they decided that the classic ineffective assistance counsel, there was a second case where counsel stood silent, offered to say nothing at sentencing. There the court put the premise of structural error. We've had a few of those cases. Yes, there are those cases. And just one brief little thing in terms of how he should have, how counsel should have addressed the obvious issues in the case in terms of the judge's possible concerns. I think that adage, first do no harm, like if you can't say anything nice, as my mother used to tell me, to affirmatively denigrate your client, to present your client as having been a personal, it's not about me. It's not about trial counsel. It's about that person who's standing next to me, his rights. Thank you. And that concludes today's arguments. We have various questions.